**Moore v. Barber**
*[Cite as 4 AOA 132]*

*Case No. CA-7960*
*Stark County, (5th)*
*Decided June 11, 1990*

*Randy McFarren, 804 Renkert Building, 306 Market Avenue North, Canton, OH 44702, for Plaintiff-Appellee.*

*Jack A. Blakeslee, 610 United Bank Plaza, 220 Market Avenue South, Canton, OH 44702, for Defendant-Appellant.*

MILLIGAN, P.J.

A Stark County Common Pleas Court jury awarded plaintiff compensatory damages of $10,000 and punitive damages of $25,000, for a total of $35,000 upon his complaint alleging malicious prosecution.

The defendant appeals the conforming judgment, assigning seven errors:

"I. THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF APPELLANT WHEN IT FAILED TO SUSTAIN APPELLANT'S MOTION FOR A DIRECTED VERDICT AT THE CONCLUSION OF APPELLEE'S OPENING STATEMENT.

"II. THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE APPELLANT BY PERMITTING THE JURY TO LISTEN TO APPELLEE MOORE'S TAPED RECORDING OF THE JANUARY 26, 1983 FIREMEN'S ASSOCIATION MEETING AT THE CONCLUSION OF APPELLEE'S TESTIMONY.

"III. THE TRIAL JUDGE COMMITTED ERROR PREJUDICIAL TO APPELLANT WHEN HE REFUSED TO ALLOW APPELLANT TO EXAMINE POLICE OFFICER FOREST A. BARBER CONCERNING APPELLEE'S CONDUCT ON THE EVENING OF JANUARY 26, 1983.

"IV. THE TRIAL JUDGE ERRED WHEN HE OVERRULED APPELLANT'S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF APPELLEE'S EVIDENCE.

"V. THE TRIAL JUDGE ERRED WHEN HE REFUSED TO GRANT APPELLANT'S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF ALL THE EVIDENCE.

"VI. THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

"VII. THE JURY VERDICT WAS EXCESSIVE BECAUSE THE ONLY ELEMENT OF DAMAGES OFFERED BY THE APPELLANT WAS THE ATTORNEY FEES HE INCURRED IN DEFENDING THE CRIMINAL PROSECUTION."

The instant action arises out of the filing of criminal charges by appellant against appellee, his arrest, trial on different charges, and acquittal.

The controversy has its genesis in the Lexington Township Volunteer Fire Department where both parties were members of the fire department and also the Lexington Township Firemen's Association, a social group composed of members of the fire department and governed by the township trustees. (T. Vol. I, p. 63.) Lester Barber (appellant) was chief of the fire department and also president of the association. Moore was a volunteer fireman. In December, Moore resigned from the fire department, effective January 1, 1983.

There had been hot blood between the parties, and there was no love lost prior to the incident in question.

(Moore had been president of the association from 1979 to 1982, prior to the term of Barber.)

Moore attended the regularly scheduled meeting of the association on January 19, 1983. The meeting was halted because the presiding officer was unsure whether Moore and others who had resigned from the fire department were eligible to vote. (T. Vol. I, p. 86, T. Vol. II, pp. 52, 122.) The issue of eligibility for membership was deferred to an unspecified future meeting, and the next meeting date was not set.

On January 26, 1983, Moore learned that a meeting was to be held at 7:00 p.m. that evening. He attended the meeting. Thereupon Barber delivered to Moore a letter advising Moore that

since he was no longer a fireman, he could no longer be a member of the association and cold not attend association meetings without invitation. (Prior to the January 26 meeting and after the January 19 meeting, Moore had written to the trustees requesting a decision about eligibility. (T. Vol. I, p. 94, T. Vol. II, p. 128.)

After reading the letter, Moore told Barber that the letter "didn't mean..shit..." since the trustees had not ruled on the issue. One of the members raised the issue of Moore's eligibility (Danny Young). (T. Vol I, p. 98.)

Moore was upset, angry and hollering. (T. Vol. II, pp. 59, 69.) One witness, Allen King, described Moore as very violent and angry (T. Vol. III, p. 163). Another witness testified that Moore threatened Barber, saying "I'm going to get you." (Taschwer.) (T. Vol. II, p. 69.)

Taschwer testified it appeared there would be a fight. (T. Vol. II, p. 69.)

Moore denied using any other foul language, threatening, or taunting appellant.

Barber asked Moore to leave the meeting and called Officer Keefer into the room. (Moore, anticipating trouble, had made previous arrangements for the police officer to be present in the building, T. Vol. I, p. 103.) Moore, who also obviously anticipated confrontation, surreptitiously tape recorded a portion of the January 26 meeting events. Thereupon Moore left the meeting room when the officer advised, "if we didn't leave the meeting I believe he would have to take things to the next step." (T. Vol. I, p. 103.)

Moore had a discussion in the hall adjacent to the meeting room with other firemen who had resigned.

Moore then returned to the meeting room ostensibly to "find out what their decisions was, if they was going to have a discussion." (T. Vol. I, p. 103.) The officer thereupon asked Moore to leave again, and Moore told Keefer to "take the next step." (T. V. I, p. 107.)

When Moore was asked about Keefer, if he was spokesman for the other former firemen, he answered, "no." (T. Vol. I, p. 107.)

Moore also observed that there were Alliance Police Officers outside the building. Moore left the meeting when asked by Keefer to do so for the third time. (T. Vol. I, p. 107.)

The next day Barber went to the Alliance Prosecuting Attorney's Office and executed a complaint alleging disturbance of a lawful meeting, a fourth degree misdemeanor, R.C. 2917.12. (T. Vol. I, p. 118.)

Gary Willen, the Assistant Prosecuting Attorney, interviewed Barber and two others who had been present at the meeting. Willen testified:

"After talking to those individuals I decided that there appeared to be probable cause..." T. Vol. IV, p. 18 (testimony of Attorney Willen).

Notwithstanding his determination that there was probable cause, Willen elected to conduct a hearing before the Acting Judge of the Alliance Municipal Court for the purpose of establishing whether or not there was probable cause to issue the complaint for the misdemeanor. T. Vol, IV, p. 18. The judge found probable cause to exist, and a warrant was issued for Moore's arrest. Shortly thereafter, he was arrested at his place of employment and was released after posting a cash bond. At his arraignment, Moore pled not guilty. (T. Vol. I, p. 121.)

Thereafter, without consultation with Barber, Willen amended the disturbing a lawful meeting charge to one of disorderly conduct, a minor misdemeanor, R.C. 2917.11.[1] The complaint Barber filed was never tried.

The cause was tried before the Alliance Municipal Court and following the trial, the court, sitting without a jury, found the defendant not guilty of disorderly conduct August 10, 1983.

On November 4, 1983, Moore filed the within malicious prosecution action against Barber.

This is the third visit of this case to this Court of Appeals.

We dismissed an appeal of the trial court judgment overruling the motion to dismiss, premised upon failure to state a claim. Case No. CA-6445.

In 1986, the trial court granted summary judgment in favor of Barber. On December 29, 1986, this Court of Appeals reversed the summary judgment and remanded the cause to the Common Pleas Court for trial.[2]

Although procedural errors are postulated the essential controversy on appeal is whether Barber acted with probable cause to believe Moore violated the criminal law and whether he is insulated by the procedures in the Alliance Municipal Court, including the actions, unilateral, of the prosecuting attorney in amending the charges.

Appellant acknowledged at the hearing that there were inaccuracies in his testimony before the magistrate who found probable cause. Critical is the question of whether these inaccuracies go to the issue of malice or go to the issue of the

physical events that are alleged to have constituted a violation of the criminal statute.

By our reversal of the summary judgment we ordered the trial court to do exactly what did - conduct a trial on the merits of the case.

The determination by the magistrate in the probable cause hearing earlier insulates the defendant-appellant here from liability unless the probably cause hearing was tainted by fraud, deception, or false or materially incomplete testimony by the complainant. See *Adamson v. May Co.* (1982), 8 Ohio App. 3d 266, 456 N.E. 2d 1212; *Turrin v. City of New Philadelphia* (Jan. 2, 1990), Tuscarawas App. No. 89AP030027, unreported.

It therefore becomes critical in analyzing the sufficiency of the evidence in the case *sub judice* to overcome the presumption of probable cause, to determine whether the testimony of Barber in the probable cause hearing so misled the trial judge. If not, the motion for directed verdict should have been sustained and the complaint in malicious prosecution dismissed.

Although it is rhetorically correct that a finding of malice can be inferred from the fact of lack of probable cause, *Melanowski v. Judy* (1921), 102 Ohio St. 153, the converse does not follow. The court (or jury) may *not* infer lack of probable cause from a finding of the existence of malice. *Turrin, supra.*

That proposition further narrows our inquiry. False or incomplete testimony in the probable cause hearing dealing with malice avail naught upon the issue of probable cause in the case *sub judice.*[3]

We have thus searched the transcript of the testimony of Barber in the probable cause hearing for what he said concerning what, in fact, happened at the meeting on January 26, 1983, and compared that testimony.

In the probable cause hearing Barber testified:

"A. Well, we, we called the meeting to order, and he said, 'You can't have a meeting.'

"COURT: He said that?

"A: Yeah, and I kinda ignored him, I said, 'Ronnie, you got a letter there,' and then I started out on another, I said, " 'Gentlemen, you've all asked for a letter, you had it, now, is there any questions on it?' and Ronnie Moore says, 'I got a letter, so?' I said, 'Well, I'm going to asked you to leave.' 'I ain't leaving.' And he told me to go to hell, some of you guys got a good memory out there, better than me. It got kind of nasty. I said,

'Ronnie, why don't you just leave. If you don't like the way things are, get a lawyer, and we'll just settle it, you know, and we'll let the Judge tell it." "The hell with the Judge. We want to settle it now.' I says, 'Ronnie, we gotta have a meeting, we gotta pay this insurance and stuff, so please leave,' he says, 'No,' I says, 'Keifer, remove him.' But he was, just didn't give a damn, Your Honor, and this has been going on for a year.

"COURT: Has he disrupted other meetings?

"A: He was president of the organization prior to me, and he's made the statement that he don't give a shit what the members says, he runs the meetings.

"COURT: But there's only been two occasions since he resigned, this last night and the week before when who weren't present?

"A: That's true, yes." Probable cause hearing, T. pp. 9-12.

At trial he testified:

"A: I said every time I tried to do something he'd yell you're out of order and object.

"Q: And that's in fact false, is it not, Mr. Barber?

"A: No, it's not.

"Q: You're telling the ladies and gentlemen of the jury every time you tried to do something Mr. Moore would say you're out of order, I object?

"A: Yes.

"Q: That's what you're telling us?

"A: That's about the size of it.

"Q: You're telling them the same thing you told, Judge Smith at the probable cause hearing then, right?

"A: He objected and hollered [sic], everybody was hollering.

"Q: Mr. Willen asked you there on the top of Page 10; now did he do that last night or was that the week before; see that?

"A: Yeah, I see that.

"Q: What was your answer?

"A: He did that last night a little bit, but I guess the week before he did it constantly.

"Q: Read the remainder of your answer please?

"A: The paper I handed him he said huh, so what.

"Q: By the paper you meant the letter you have gave him, correct?

"A: Correct.

"Q: So you told the judge his response when he got the letter was, huh so what. Down in the middle of Page 10 there, Mr. Barber the court asked you; well, just tell me okay you started,

you called the meeting to order last night. You said; yes. Isn't it a fact you called the meeting to order after Mr. Moore was out of the room?

"A: No, I called a meeting -- I can't see where you're reading, but I called the meeting to order at 7:00 o'clock.

"Q: Mr. Barber, there on top of Page 11 you're saying gentlemen you have all asked for a letter, you have had it. Now, is there any question on it.

"A: Where are you at?

"Q: On top of Page 11.

"A: Okay.

"Q: You've all asked for a letter. You've had it. Now, is there any question on it, is that your response to a question by --

"A: Randy, where you at?

"Q: On top of Page 11.

"A: Okay.

"Q: That's you talking, right?

"A: Yeah.

"Q: In fact Mr. Moore tried to ask questions and tried to question your position on this and you wouldn't permit it, would you?

"A: Me and Moore went back he says I got a letter from the chief, it don't mean shit.

"Q: But you wouldn't allow him to remain in the meeting and question your position in this letter?

"A: I told him, no put it in writing, give it to the membership and we'll give him a trial.

"Q: Isn't it a fact he asked for a decision of the membership at that meeting he asked for a vote of the members on this issue?

"A: The way that room was, he could have asked for a divorce and I couldn't have heard him.

"Q: Now, you told the judge he told you to go to hell; did you hear that?

"A: Yes, I heard that.

"Q: Mr. Moore said that?

"A: He also told the judge to go to hell.

"Q: You told that to the judge at the probable cause hearing, did you not?

"A: He said it. Said he didn't give a damn about the judge is what he said.

"Q: You told the judge that at the probable cause hearing Ron Moore said he didn't give a damn about the judge?

"A: Yes.

"Q: You didn't tell the judge though you asked Mr. Moore specifically are you disturbing this meeting. Mr. Moore responded no. You didn't tell the judge that at the probable cause hearing, did you?

"A: No, I don't know. Is it in here? If it's in here I did, if it isn't, I didn't.

"Q: If somebody says if there is some testimony, some evidence that you said are you disturbing this meeting and Mr. Moore said no, is that accurate or inaccurate?"

"MR. JAKMIDES: Object.

"THE COURT: Objection overruled.

"A: If he would have said it probably in his state of mind he didn't think he was."

*MR. MCFARREN:*

"Q: Mr. Barber, are you denying you said to Mr. Moore are you disturbing this meeting and Mr. Moore responded to you, no?

"A: I'm not denying it, I don't remember.

"Q: There at the end of that answer we were just dealing with on Page 11 you said but he was -- just didn't give a damn you honor, and this has been going on for a year; do you see that?

". . ."

"A: It has been going on for a year.

"Q: That's what you said?

"A: Let's put it this way, I --

"Q: Mr. Barber, I'm not asking you that. I'm asking you yes or no did you make that statement?

"A: I'm not answering that yes or no.

"Q: Would the court instruct the witness.

"THE COURT: You may answer the question yes or no. If you don't know, you don't know, Mr. Barber?

"A: I don't know."

*MR. MCFARREN:*

"Q: Mr. Barber, are you telling me that you don't remember making this statement to the judge at the probable cause hearing?

"A: This is six year [sic] ago, Randy.

"Q: You don't recall making that statement?

"A: Let me remember this.

". . ."

"A: I don't recall.

". . ."

"A. I don't recall."

*MR. MCFARREN:*

"Q: You don't recall. Thank you. Is there any reason for you to believe that this transcript is not accurate?

"A: No, I have no reason. I believe in courts.

"Q: Now Mr. Barber, isn't it a fact you led that judge to believe this has been going on for a

year when in fact Mr. Moore was president of the association for the prior year?

"A: What are we talking about Randy?

"Q: Was Mr. Moore president of the association in 1982?

"A: Yes.

"Q: So why would Mr. Moore interrupt his own meeting; that's what you told the judge here?

"A: Mr. Moore kept interrupting all the trustees meetings.

"Q: Mr. Barber, we're talking about the association meeting here?

"A: You said meetings.

"Q: Association meetings?

"A: He would interrupt, he did interrupt he wouldn't accept the check." T. Vol. IV, pp. 119-125.

Taken most favorably to Moore the discrepancies amount to (1) an assertion that his disruption of the meetings had gone on for a year, (2) failure to advise the probable cause magistrate that Moore was president of the association during that period, and (3) whether the letter was given to Moore before or after the meeting was called to order. We do not find these to be material on the question of what, in fact, happened at the meeting on January 26, 1983.

We have also examined the testimony of others (who did not testify in the probable cause hearing). William Taschwer testified that Moore refused to leave the meeting, and there was an argument between Barber and Moore (T. Vol. II, p. 59); that Moore threatened Barber saying, "I'm going to get you. . ." (T. Vol. II, p. 69). To the contrary Robert Beatty testified that Barber was the one using profanity and Moore never made any threats (T. Vol. II, p. 90); that Moore remained calm during the entire January 26 meeting and never raised his voice (T. Vol. II, p. 100). Larry Gatts testified to the same effect. Beatty and Gatts were among the resigned officers who also received letters that evening. (T. Vol. II, p. 57.) William Pinkerton testified that it was Barber who used foul language during the meeting (T. Vol. III, p. 16). Ronald Young claimed the personal burden of most of the argument with Barber, claiming it was not Moore (T. Vol. III, p. 58).

(A hotly debated issue in the trial was whether the meeting in question was ever called to order, or whether all of the events took place before the meeting was called to order. This dispute focuses on the difference between the charge of obstructing a meeting and disorderly conduct. If the charge of obstructing had been the basis of the municipal court trial this would have been a relevant issue. In the charge of disorderly conduct it was irrelevant and misleading in that the jury was led to believe that it was the disruption of the meeting that was the disorderly conduct.)

We conclude that the evidence, construed most favorably to the plaintiff-appellee, does not support the inference that Barber lied or committed material omissions as to the events on January 26 in his testimony before the magistrate. Thus the presumption of probable cause with which Barber was cloaked by the magistrate's ruling persists, and Barber was entitled to a directed verdict in his favor at the conclusion of the plaintiff Moore's case.

We address each of the assignments of error.

I

We overrule the first assignment of error for the same reasons we reserved the original summary judgment. The allegations that "some of the evidence [given to the magistrate] was false and that that evidence was intentionally false and incomplete" survived summary judgment. It also thus survives the motion to dismiss at the conclusion of opening statement.

II

The trial court did not err in allowing the surreptitious tape recording of parts of the events of the evening in question. The tape is no more hearsay than a picture of the event would be.

The second assignment of error is overruled.

III

Appellant sought to present testimony that when he was observed outside the entry to the meeting hall Moore was "very angry, was obviously angry, was combative, and was loud and profane." (T. Vol. III, p. 146.)

The trial court had previously denied to defendant the right to demonstrate portions of the tape recording of events that transpired outside the meeting hall. The ruling denying the right to present this testimony was a *quid pro quo* order.

We conclude that it was an abuse of discretion to deny admission of this evidence. It was timely and relevant as bearing upon the conduct and behavior of Moore at and around the time of the alleged criminal offense. It was particularly relevant to the question of whether there was probable cause to believe that Moore violated the disorderly conduct charge (of which he was found guilty). It was also relevant and material inas-

much as testimony of prior relations between the parties was the subject of substantial testimony.

The third assignment of error is sustained. The appropriate remedy for this error is a new trial.

## IV

For the reasons stated above, we sustain the fourth assignment of error. The trial court should have granted a directed verdict.

## V

For reasons above stated, the fifth assignment of error is sustained.

## VI

For reasons stated above, the jury verdict is against the manifest weight of the evidence.

The sixth assignment of error is sustained.

## VII

Having ruled that the cause should not have been submitted to the jury, we are unable to rule on whether the damages are excessive.

The seventh assignment of error is overruled.

The judgment of the Stark County Court of Common Pleas is reversed, and the cause is dismissed.

*Judgment reversed.*

SMART, J. and GWIN J., concur.

---

[1] The original charge, disturbing a lawful meeting, R.C. 2917.12, calls for maximum sentence of 30 days incarceration, a maximum fine of $250, and the right to trial by jury. The disorderly conduct charge, upon which Moore was tried, calls for a maximum penalty of a $100 fine, 0 days of incarceration, and does not entitle the accused to a jury trial.

[2] In the 1986 summary judgment appeal the majority (Judges I.G. Turpin and E.E. Wise) concluded that the affidavit of Moore that "the testimony of Lester J. Barber is false and incomplete..and intentionally false and incomplete," raises a genuine dispute upon the material issue of probable cause. The dissent (Judge J.R. Milligan) argued that the affidavit was conclusory and legally insufficient to create a Civ.R. 56 fact issue. The articulated issue, per *North v. Pennsylvania Railroad Co.* (1967), 9 Ohio St. 2d was "whether the findings of probable cause was based upon intentional false and incomplete testimony of Lester J. Barber."

[3] Thus if the complainant stated in the probable cause hearing that the defendant was his best friend - a patent lie- that would be irrelevant in the malicious prosecution case.